## THE GAZELLE.

### LINKLATER v. THE GAZELLE.

*(District Court, N. D. Illinois.* November 28, 1887.)

1 COLLISION—FAILURE TO MAKE LIGHT.

The J., a sailing yacht of about seven tons, sloop-rigged, was coming through the south-east passage of the outer breakwater, at Chicago, at a speed of two and three-fourths miles, with a light south-west wind, when the propeller G., bound for South Chicago, left her landing at the foot of Harrison street, and laid her course, at a speed of four and one-fourth miles, for the same passage. The J. carried but one light, a bright white one; but that was placed on her pawl-post, just forward of her mast, where it could be plainly seen by any vessel approaching her from directly ahead or forward of either quarter. The course of the two vessels was such as to cause them to approach each other substantially bows on. When 600 feet apart, the light was plainly seen by passengers of the G., which vessel was about that time hailed by the J. The G. kept on with the light in full view until but 200 feet lay between her and the J. Her lookout then made the light for the first time, and the wheel was at once put to port and the bell rung to stop and back. The J. was struck on the starboard quarter, and sunk, becoming a total wreck. *Held,* that the G. was altogether at fault in not having made the light of the J. until the collision was unavoidable.

2. SAME—PLEASURE YACHT—CUSTOMARY LIGHTS—REGULATION LIGHTS.

A collision occurred in Chicago harbor on a summer night, when the waters were alive with pleasure crafts. The J., the vessel sunk, was a seven tons sloop-rigged sailing yacht, and she carried the light customary with vessels of that sort in those waters, viz., a single bright white light, placed on her pawl-post, just forward of her mast. She was not enrolled and registered for commerce under the navigation laws. The G., the vessel in fault, was in command of an officer familiar with the waters of the harbor and the fact that they were frequented by many vessels like the J., and that they carried but the one light. *Held,* that the G. was estopped to set up the defense that the collision was caused by the failure of the J. to carry the regulation lights.

3. SAME—DAMAGES.

The sunken vessel, which was a total loss, was nine years old, having been in the possession of the libelant about five years. She cost him $250, and he put $350 worth of repairs upon her. In addition, she had $100 in personal property aboard when she was sunk. It was in evidence that a new yacht of the same size and rig could be built for $700. *Held,* that $500 damages should be awarded.

In Admiralty. Libel for damages.

*Schuyler & Kremer,* for libelant.

*R. Rae,* for respondent.

BLODGETT, J. The libelant in this case seeks to recover the damages sustained by him as owner of the sailing yacht Josie, by reason of a collision between the propeller Gazelle and said yacht in the waters of the Chicago outer harbor. The facts, as they appear in the case from the proof, are that the Gazelle was, during the summer season of 1886, employed as an excursion steamer in the Chicago harbor and vicinity, and had been so engaged under the command of the same master for the two preceding seasons. The Josie was a sailing yacht of about seven tons measurement, sloop-rigged, and used by her owner in giving excursions, and taking out sailing parties upon the waters of the harbor and vicinity. The proof shows that a large number of sailing yachts similar to the

Josie had been employed in the same kind of business during the summer seasons for many years past, about the basin and waters of the Chicago harbor; and that such yachts, as a rule, carried a single white light at some point forward of their foremast, so as to be clearly seen by other craft approaching them from ahead or on either quarter.    On the evening of July 6, 1886, the Gazelle left the landing at the foot of Harrison street with a large number of excursionists on board for South Chicago or that vicinity, and laid her course for the south-east passage, through the outer breakwater.    The yacht Josie had been out on the lake with a small party, and, about the time the Gazelle left the landing, the yacht was coming into the basin of the outer harbor through the south-east passage. The wind was from the south-west, and quite light, so that the Josie, standing on her course to her proposed landing, one block south of the foot of Harrison street, was not making more than two and one-half to three miles headway per hour.    The Gazelle was probably running, from the time she shaped her course for the south-east passage, at about four or four and one-half miles per hour.    The course of the two vessels was such as to cause them to approach each other substantially bows on. When from 200 to 300 yards apart, the master of the Josie, seeing the Gazelle was coming directly towards him, hailed the Gazelle so loudly that the passengers on her heard the hail, asking if they were going to run into him.    At that time the light on the Josie was plainly visible to the passengers on the promenade deck of the Gazelle.    No notice was apparently taken by the officers in charge of the Gazelle of this hail, and no attempt made to change the course of the Gazelle, until the two vessels were probably within less than 200 feet of each other, at which time, as the captain of the Gazelle testified, his mate, who was acting as lookout, and who was standing on the hurricane deck in front of the pilot-house, called his attention to the light on the Josie, and the captain, on seeing the light, and seeing that it did not change position with reference to his course, ordered the wheel to be put to port, and immediately following that order rang the bell to stop and back.    The vessels were then in too close proximity to prevent a collision, but, undoubtedly, the headway of the Gazelle had been considerably checked, because she struck the Josie with only sufficient force to break in her starboard quarter; when, if she had been going at the full speed of four and one-half miles, it is probable that she would have gone directly over her. The Josie sank within a few moments, and became a total wreck, the amount of wreckage saved from her selling for only about $15.

Two defenses are interposed: (1) That the officers of the Gazelle were guilty of no negligence, and did all they could to avoid the collision, as soon as the light on the Josie was discovered; (2) that the Josie was not carrying such lights as are required by the sailing rules enacted by congress for the purpose of preventing collisions.

As to the first point made by the defense, the evidence seems to me conclusive and overwhelming that the light from the deck of the Josie was plainly visible from the point where the lookout was standing, as his station was fully as favorable for the purpose of seeing lights upon

the water as that of the promenade deck, when the vessels were at least 600 feet apart, and that her light continued in sight, from both decks of the Gazelle up to the time of the collision. The passengers upon the deck, who have testified in regard to the matter, say they heard the hail or call from the deck of the Josie, and saw her light some, when she was 200 yards away, or 250 yards away; others, when she was 100 yards away; others, when she was two or three blocks away,—the different estimates of the distance by the different witnesses arising from the fact that each witness gives his estimate of the distance the vessels were apart at the time he first saw the lights on the Josie, and heard the hail. It is hardly possible or probable that all these witnesses from among the passengers on the Gazelle saw the Josie or her lights at the same time. It is clear, however, that they did see her lights, and heard the hail, for what might be considered, under the circumstances, some considerable time before the light was seen by the lookout, or the captain; because the wheelsman says he received the order to port, and threw the wheel over as quick as he could, put his foot on the spoke to hold it there, and looked out; and then saw the spars of the Josie just abaft the flag-staff, and instantly afterwards the stop and reverse bells were rung, and then came the collision. It is clear to my mind, from this testimony, that the Gazelle was not discovered by the lookout or the captain until they were so close to the Josie as to render the collision imminent, if not unavoidable; and it is equally clear, from the testimony of other witnesses, that a vigilant lookout upon the hurricane deck of the Gazelle should and could have seen the light upon the Josie in ample time to have avoided a collision. The proof shows that the Josie carried a bright white light upon her pawl-post, just forward of her mast, the Josie being sloop-rigged, where it could be plainly seen by any vessel approaching her from directly ahead, or forward of either quarter. The proof shows that this light was seen by persons upon the shore near the point from where the Gazelle started, and by the witnesses Mr. and Mrs. Freineaux at distances even greater than those estimated by the witness who saw the light from the promenade deck of the Gazelle. I have therefore no doubt that, if the lookout of the Gazelle had done his duty, and kept the vigilant watch which was demanded under the circumstances, he could have seen, and would have seen, the Josie long before he did do so, and that the collision could readily have been avoided if this lookout had not been negligent. The lookout has not been produced as a witness, and we have, therefore, no explanation from him as to why he did not see the Josie's light sooner.

As to the second point, that the Josie was not carrying the lights required by the sailing rules, the proof shows that she was not a vessel enrolled and registered for commerce under the navigation laws of the United States. She was of less than 10 tons burden, and was only used as a yacht or harbor craft; and the proof shows that in the Chicago harbor it had been the usage, for many years prior to this collision, for yachts of this description to carry a light such as the Josie was carrying upon the night in question,—a single white light forward of the mast, where it could be seen from any point forward of her quarter. The proof

shows that this basin and the adjacent waters on summer nights was. alive, so to speak, with skiffs and sailing yachts carrying parties for pleasure; and the captain of the Gazelle, having had three seasons' experience in running upon these waters, must have known that he was in constant danger in making the passage from the Harrison-street landing to either of the passages through the breakwater, of colliding with some of these numerous craft. And he also, from the testimony, must be charged with knowledge of the kind of lights they carried, as well as the necessity of keeping a vigilant lookout for those lights; and it seems to me there can be no doubt that, with this knowledge, it is no excuse, for a collision like this, to say that the water-craft run into or sunk had not the regulation lights on board. As already said, he knew what kind of lights. this class of vessels carried, and it was his duty to look out for that kind of lights, and avoid them. The rule that a steamer should keep out of the way of a sailing vessel is as applicable, it seems to me, to a small pleasure yacht like this, as it would be to a larger vessel engaged in commerce instead of pleasure; and hence it is no excuse for the negligence shown by the officers in charge of this vessel that she had not the regulation lights displayed.

I understand that since this accident the attention of the board of inspectors has been called to this matter, and an order has been promulgated requiring craft of the character of the Josie to carry side lights; and I do not intend to be understood in holding the Gazelle liable for this collision to say that, if a collision should now happen between a steamer and one of these small pleasure yachts carrying a single white light as the Josie did, there might not be a greater degree of negligence chargeable to the yacht than can be in this case. But here we have the officers of the Gazelle chargeable with notice—*First*, that they were in constant danger of meeting with, and must avoid, this great number of small yachts upon the waters of the harbor; and, *secondly*, of the kind of lights that this craft carried in the night-time; and hence the officers and crew of this steamer must be held to a due and proper vigilance to avoid collision with this kind of craft. I therefore feel compelled to find that the collision in question occurred solely by reason of the want of due care on the part of the officers and crew of the Gazelle, and must hold her responsible for the damages.

I have had some difficulty in satisfying myself as to the amount of damages that should be awarded to the libelant in this case. The libelant himself, who was her owner, testifies that the Josie was worth $800 in cash, and that he lost about $100 worth of personal property which was on board of her. The proof shows that she was nine years old; that libelant had owned her four or five years; that he paid $250 cash for her; and had put about $350 worth of repairs upon her during the time he owned her. The proof also shows that a new yacht of the size and rig of the Josie could be built for about $700 cash. In view of all the testimony in the case bearing upon the question of the amount of the libelant's damages, and what would make him substantially good for his loss, I have concluded to fix the damages to be paid by the Gazelle at the sum of $500, and a decree will be entered for that amount. .